UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RANDY K. HITDLEBAUGH,

          Plaintiff,                      Civil Action No. 10-cv-13115

      v.                             District Judge Bernard A. Friedman
                                     Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 14]**

      Plaintiff Randy K. Hitdlebaugh brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties filed summary judgment motions, (Dkts. 11, 14) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.  RECOMMENDATION**

      For the reasons set forth below, this Court finds that while the ALJ failed to fully comply with the reasons-giving requirement of the treating physician rule, this error is harmless when reading the ALJ's narrative as a whole.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

Plaintiff alleges that he became unable to work on November 21, 2003.  (Tr. 16.)  The Commissioner disapproved Plaintiff's disability claim on August 27, 2007.  (Tr. 74-79.)  He then filed a timely request for a hearing, and on September 15, 2009, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") B. Lloyd Blair, who considered the case *de novo*.  (Tr. 40-71.)  In an October 19, 2009, decision, the ALJ found that Plaintiff was not disabled.  (Tr. 13-24.) The ALJ's decision became the final decision of the Commissioner on June 30, 2010, when, after considering additional exhibits, (Tr. 153-62, 484-89, App. Council Exs. 12E, 14F), the Appeals Council denied Plaintiff's request for review.  (Tr. 1-4.)  Plaintiff filed this suit on August 6, 2010.

### B. Background

Plaintiff was 53 years old at the time of the ALJ's decision.  (Tr. 45.)[1]  He has a twelfth-grade education.  (*Id.*)  From 1986 to 2003, Plaintiff operated heavy equipment, such as "large dump trucks, bulldozers, and back hoes," at the Sock Hills Trails landfill.  (Tr. 45, 122.)

#### 1.  Plaintiff's Testimony

At the September 15, 2009, hearing before the ALJ, Plaintiff testified to four physical conditions: high blood pressure, diverticulitis, left shoulder arthritis, and foot pain from a bone spur (i.e., plantar fasciitis).  (*See* Tr. 47.)  Regarding his blood pressure, Plaintiff explained that he takes "three pills," which include Lisinopril and Norvasc.  (Tr. 48.)  As for his diverticulitis, he said that it prevents him from eating "corn on the cob and peanuts," and that he also avoids cucumbers and

---

[1]The regulations consider Plaintiff to be a person "closely approaching advanced age (age 50-54)." *See* 20 C.F.R. § 404.1563(d).

strawberries—"anything with a seed in it[,] I'm scared to death [of] now." (Tr. 49.) He explained that when he experiences a diverticulitis "attack," his stomach could be in pain for up to three weeks. (Tr. 48.) Plaintiff began having shoulder problems in 2007, and stated that while no physician had recommended surgery, x-rays revealed the "start of arthritis." (Tr. 50.) Plaintiff attested that he could only lift 15 pounds comfortably. (Tr. 58.) Plaintiff's foot pain arose in 2006, but no physician had suggested surgery for it. (Tr. 49.) Plaintiff explained that he was given a splint to wear on his foot at night, and that he still occasionally uses that splint. (Tr. 49.) Because of his foot pain, Plaintiff testified that he could only stand for about two hours in an eight-hour day, and suggested that standing for three or four hours would result in him later "pay[ing] for" that effort. (Tr. 59.) He also said that he could walk "less than a block" before having to stop. (Tr. 58.)

Plaintiff also testified to mental conditions of depression and anxiety. Regarding medication, Plaintiff stated that he had tried "almost everything that you can think of." (Tr. 51.) At the time of the hearing, Plaintiff was taking Klonopin. (*Id.*) He explained that he did not have any side effects from that or any other medication he was then taking. (Tr. 51-52.) He also told the ALJ that he had seen a counselor for "two or three years," but because his lifetime insurance benefits had run out, he was not in counseling at the time of the hearing. (Tr. 50.) Plaintiff said that there are days when he does not want to see anyone, and that he has four bad days and three good days per week. (Tr. 60.)[2]

Plaintiff also recounted a "racing thoughts" episode that he experienced on his drive to the

---

[2]In his self-completed Function Report, Plaintiff said, "I have 2 kinds of days[.] On good days I have little breakfast[,] do chores[,] go for walk[,] visit sister [and] try to have [a] good day[.] On bad days I don't even care if I get out of bed as my mind has a million things going throue [*sic*] it[;] I can't control it." (Tr. 127.)

hearing.  (Tr. 61.)  Specifically, he explained that he was "really worried" because he was not accustomed to driving very far, and that he almost pulled over into a rest area because of the episode.  He noted that these types of "racing thoughts . . . can happen any time."  (Tr. 61.)  He also testified to accompanying physical symptoms: "my hands got sweaty on the wheel and it just—you know, I was really sweaty."  (*Id.*)

Plaintiff lives with two dogs in a one story house.  (Tr. 55.)  He said he cooks, does laundry, and shops for groceries.  (Tr. 55.)  He testified that he mows his lawn with a tractor but said he would be unable to do so by foot.  (*Id.*)  He enjoys watching NASCAR, and watches TV in the evenings.  (Tr. 58.)  Describing a typical day, Plaintiff said his dogs wake him around 6:30 or 7:00 a.m., he takes his medications, and then "tr[ies] to figure out what [he's] going to do the rest of the day."  (Tr. 57.)  In the afternoon, he works on restoring a car that is owned by his landlord.  (Tr. 57.)  Plaintiff usually goes to sleep around midnight or earlier.  (Tr. 57.)  He visits his sister, does Bible studies with someone who comes to his home once a week, and occasionally volunteers at the Veterans of Foreign Wars ("VFW") nearby his home by washing dishes.  (Tr. 46, 56.)

### 2.  *Medical Evidence*

#### (a) Plaintiff's Mental Conditions

In the fall of 2003, Plaintiff was having difficulty tolerating the stress from his work at the landfill.  (*See* Tr. 297.)  It appears that several years prior, new owners took over the landfill and promoted Plaintiff to a position which he did not like.  (Tr. 297.)  Plaintiff stated that a request to transfer back to his prior position was denied.  (Tr. 297.)  He sought treatment from Dr. David Mika, a family practitioner, who prescribed Paxil in November 2003, and then referred Plaintiff to Advanced Behavioral Medicine, P.C. ("ABM") in December 2003.  (Tr. 384-85.)

ABM treated Plaintiff for his mental conditions from December 2003 to May 2007.  Over that time, Plaintiff had 95 counseling sessions with Steven Bon, a clinical social worker.  He also met regularly, although less frequently, with Dr. Michael Rockwell, and later, Dr. Marla Hires, who prescribed and monitored Plaintiff's various medications for his anxiety and depression.

At his initial visit with ABM in December 2003, Dr. Rockwell diagnosed Plaintiff with "major depression, single, severe" with a Global Assessment Functioning ("GAF") score of 60. (Tr. 297-300.)[3]  He noted that because of changes at work that Plaintiff disliked, "[he] feels [like] a different person now, stressed and depressed, went from loving life to not caring, neglects his friends.  He denies social anxiety features; he is not afraid of people just upset with all their needs/complaints.  In the past two years the depression has grown a lot worse."  (Tr. 297.)  Dr. Rockwell also noted that Plaintiff "looks anxious, depressed and somewhat scared/overwhelmed," and remarked that Plaintiff "is in a high risk category for suicide, despite his denial of plan/intent; he is . . . depressed, lonely, isolated, drinking . . . [and] ha[d] a [brother who committed] suicide." (*Id.*)

Plaintiff's initial meetings with Mr. Bon focused primarily on Plaintiff's anxiety about his work situation, and whether he would obtain medical-retirement benefits.  (Tr. 274-290.)  In

---

[3]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30 (4th ed. 1994).  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id*. at 32.  A GAF of 41 to 50 means that the patient has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id*.  A GAF of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.  *Id*.  A GAF of 61 to 70 signals "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well . . . . some meaningful interpersonal relationships."  *Id*. at 34.

December 2003, Mr. Bon also assigned Plaintiff a GAF score of 60 (Tr. 296), and noted that "[client] remains highly anxious about his work situation. Talked about how he felt suicidal when the job was overly stressful." (Tr. 289.) In January 2004, Mr. Bon noted that Plaintiff's "[f]inances are stressed so he still feels depressed and anxious," and that Plaintiff was "[n]ervous" about physician evaluations that might be a prerequisite for medical retirement. (Tr. 286.) Plaintiff also told Mr. Bon about a suicide attempt during the previous September, and ruled out going back to his old job because of that risk. (Tr. 284, 286.) In February 2004, Mr. Bon noted "Mr. Hitdlebaugh is anxious about the wait for his medical retirement. . . . [he] again states that working under the stress he had been under was worse and he has promised himself he would not go back to that stress." (Tr. 280.)

In or around March 2004, a psychiatrist evaluated Plaintiff in connection with his retirement benefits application and found that Plaintiff could return to his job.   (*See* Tr. 276.) Contemporaneous session notes reflect that Plaintiff was "discouraged with increased depression." (*Id.*)  Mr. Bon noted that Plaintiff did "not believe that he could go back to work at [his] old job without putting himself back into the stress that led to the suicide attempt." (*Id.*)   Plaintiff's diagnoses was "major depression, single severe, alcohol abuse, cannabis abuse." (Tr. 274.)

In April 2004, Plaintiff had a second evaluation in connection with his application for retirement benefits and this evaluator told Plaintiff he would certify his major depression. (Tr. 268.) Plaintiff was relieved, and told Mr. Bon that this was "like a house coming off his back." (*Id.*)  In early May 2004, Mr. Bon stated that Plaintiff "expressed great relief and satisfaction at the resolution of his disability pay through the pension board." (Tr. 264.) Regarding "progress toward treatment goals," Mr. Bon remarked, "Hitdlebaugh [is] showing improved affect with the relief of

6

getting disability pension." (*Id.*)

Later in May 2004, Mr. Bon noted that Plaintiff was getting more comfortable with early retirement, had been working in his yard, interacting "more easily" with others, and had shown "improved mood" and was "adjusting to reduced anxiety." (Tr. 260-61.) In June 2004, Mr. Bon and Dr. Rockwell no longer endorsed the diagnoses of "major depression, single, severe." (Tr. 256.) Instead, Plaintiff was diagnosed with "major depression, single, in partial remission." (*Id.*)

In July 2004, Mr. Bon noted that Plaintiff was "noticing some depression as he settles into routines. . . . As he has adjusted to his medical retirement he is noticing the days dragging on. He feels he doesn't have enough to do and is getting lonely especially during the day hours." (Tr. 253.)

In August and September 2004, Plaintiff appears to have been doing relatively well. Mr. Bon noted that Plaintiff was "relieved with reduced financial stress, content with current medication treatment." (Tr. 248.) He also commented that Plaintiff "[is] pleased when he is being productive." (*Id.*) Dr. Rockwell remarked that Plaintiff was "perhaps as 'upbeat' as I have known him, overall still restricted." (Tr. 250.) He also noted that while Plaintiff reported depression, Plaintiff also felt that "it is way better compared to times past; no more 'bad thoughts.'" (Tr. 243.) From September 2004 through December 2004, Plaintiff's diagnoses remained the same—his depression was in partial remission. (Tr. 236, 245.)

In January 2005, Plaintiff reported to Mr. Bon that he felt anxious because of the addition of a house mate. (Tr. 235.) During this time, Plaintiff was also working at an auto-body repair shop and volunteering at VFW. (Tr. 238-40.) Regarding the latter, Plaintiff noted that volunteering at the concession stand at the VFW's bingo night made him "anxious" because of "the volume of people placing orders." (Tr. 234.) Although it reminded him of his old job at the landfill, Mr. Bon

7

remarked that Plaintiff "was able to draw distinctions that made his VFW hall work different," and that he was "coping with new social anxiety." (*Id.*)  In March 2005, Plaintiff was again diagnosed as depressed, single episode, and in partial remission. (Tr. 229.)  Mr. Bon noted that Plaintiff "has been able to keep [the stresses of the house-mate and the VFW] in perspective" and "been able to stay optimistic." (*Id.*)

In May and June 2005, Plaintiff reported that he was "doing more work at the body shop part time.  He likes the work and feels no pressure or depression." (Tr. 222-24.)  Plaintiff was "working at the body shop for two to three days a week," which he felt was productive. (Tr. 119.)  Plaintiff's diagnoses remained "major depression, single episode, in partial remission." (Tr. 220.)

In July 2005, Plaintiff told Mr. Bon that his anxiety heightened when he received a letter asking him to document his disability. (Tr. 218.)  Mr. Bon noted, "Mr. Hitdlebaugh is anxious about being forced to return to a work environment that had him feeling suicidal two years ago." (*Id.*)  Later that same month, Plaintiff expressed relief about his home being sold and being in a better financial picture but had "some anxiety about things going too well." (Tr. 216.)

In August 2005, Mr. Bon noted that Plaintiff was "managing his anxiety fairly well.  He feels the medication has helped." (Tr. 214.)  In September, Plaintiff was helping a friend with some work, but was "anxious with the deadlines" and "feeling pressure" which again reminded him of his old job.  (Tr. 213.)  Mr. Bon noted that Plaintiff was depressed "but without a particular trigger." (Tr. 211.)  He also remarked that Plaintiff "continues to see himself as unprepared to handle his anxiety and depression.  His current depression is mild and he is active in taking care of personal business." (*Id.*)

In October 2005, Plaintiff's primary care physician, Dr. Mika, asked Plaintiff if he thought

he would return to full-time work.  Plaintiff reported to Mr. Bon that he was surprised at this question, and that the inquiry made him anxious.  (Tr. 120.)  Plaintiff questioned whether Dr. Mika understood how anxious and depressed he had been at his old job.  (Tr. 210.)  Around this time, Plaintiff saw Dr. Hires, who noted that Plaintiff is "experiencing [an] increase in depressive symptoms.  His mood is a bit more sad.  When he has a bad day it takes him longer to pull out of it."  (Tr. 209.)  Mr. Bon noted that Plaintiff's "depression seems to have a seasonal flavor to it."  (Tr. 208.)

From November 2005 to January 2006, Plaintiff expressed that work was going well at the body shop.  In November 2005, Plaintiff reported being in a good mood, and that he liked the part-time work he was doing at the shop; Mr. Bon noted he "[f]eels he can be productive without the stress the previous job created."  (Tr. 207.)  He told Dr. Hires "we've been really busy at the body shop—it feels great," but that he still gets anxious if he thinks about his landfill work.  (Tr. 201, 206.)  Plaintiff also acknowledged that he was doing better, but was worried about a setback.  (Tr. 199.)  Around this time, Dr. Hires noted that Plaintiff "seems to be improving," and she emphasized that "the medications are most likely doing the best they can do and [that] the rest is up to him."  (Tr. 200.)

In February 2006 Plaintiff received a form letter announcing a change in wording to his retirement benefits.  (Tr. 198.)  This placed Plaintiff "in a high state of anxiety."  (Tr. 198.)  Mr. Bon's notes provide: "[Hitdlebaugh] states he keeps thinking how bad it would be if someone told him he had to go back to the work environment where he was feeling suicidal."  (Tr. 198.)  In March, however, Mr. Bon noted that Plaintiff was "handling some stress at [his] part time job well" and that Plaintiff was "feeling stable in his current coping."  (Tr. 195.)

In spring and early summer 2006, Plaintiff reported that "[w]ork at the body shop has been steady and productive." (Tr. 190, 194.) He reported to Mr. Bon that he "[l]ikes feeling productive and his finances are helped by the work." (*Id.*) Mr. Bon noted that "[client] feels his anxiety is under control and appears to be in good spirits." (*Id.*) In July, however, Plaintiff expressed anxiousness about his susceptibility to depression and fear about returning to his old job. (Tr. 186.) Plaintiff also noted that he had not been working at the body shop as much, and Mr. Bon noted that his "[d]epression seems related to lack of productivity and social isolation." (*Id.*)

Plaintiff's treatment records from the fall of 2006 and into the winter of 2007, have a similar flavor to those from preceding months. In August 2006, Plaintiff had problems eating, which appear to be related to his diverticulitis. Dr. Hires noted that "this has really gotten him down. Mood worse." (Tr. 184.) She also remarked, however, that Plaintiff was "over most of [his] stress issues," and "now thinks that the depression is the main issue." (*Id.*) In September 2006, Plaintiff told Dr. Hires that "[a]ny little thing makes him irritable—panic" and that he had some agoraphobia: "[d]oesn't like going in crowds, even with people he knows." (Tr. 181.) In October 2006, Mr. Bon noted "[client] gets mildly anxious still about his work disability—what if he lost it." (Tr. 177.) But he also told Mr. Bon that "most days he feels content, but a few days a week he gets to feeling lonely and sad. Once he falls into the sadness it is hard to get back to a positive state." (*Id.*) It appears that Plaintiff remained working, and reported working 8-12 hours a week in November 2006. (Tr. 174.) As Thanksgiving approached, Mr. Bon remarked that "[client's] mood was positive and his ideas optimistic." (*Id.*) Plaintiff was also thinking of volunteering for the Salvation Army at the time. In January 2007, Plaintiff expressed fear that "people judge him for not working, but don't understand how disabling his depression has been." (Tr. 171) Mr. Bon noted that Plaintiff "had

been more depressed over New Year—isolated at home.  The last two weeks he has gotten out more and is being more social. [Client] satisfied with his current mood."  Dr. Hires remarked that "[w]inter has not been as depressing this year as in the past."  (Tr. 169; *see also* Tr. 168.)

In March 2007, Plaintiff learned that his insurance benefits had a lifetime limit on counseling sessions.  (*See* Tr. 166.)  Mr. Bon noted, "[client] dreads any kind of setback and sees dire results if cut off from [treatment]" and that Plaintiff was "anxious with depressed mood" since learning he had maxed out his mental health benefits.  (Tr. 165-66.)  Although Plaintiff attempted to work out a plan to obtain counseling on a monthly basis, it appears that counseling proved too expensive.  (Tr. 51 (noting $100 out-of-pocket cost), 164.)  The last counseling note from ABM in the record provides,

> [I] [r]einforced [to Hitdlebaugh] that he has developed capabilities for managing stress while acknowledging deficits he still encounters. . . . [Client's] stress level goes up with each challenge to his coping.  Challenge becomes hard, but he is aware that he needs to expand his social support.  Still gets very anxious in thinking about work situations that led to feeling suicidal.  With his brother having committed suicide, these thoughts become disabling. [Client] working on building up his confidence.

(Tr. 163.)

In August 2007, John Jeter, a limited licensed psychologist, examined Plaintiff on behalf of the state Disability Determination Services ("DDS").  Regarding Plaintiff's anxiety, Mr. Jeter remarked as follows: "Symptoms: difficulty controlling worrying, difficulty concentrating, mind going blank, irritability, general apprehensiveness, difficulty falling or staying asleep[,] and feeling keyed up all the time."  (Tr. 312.)  He noted that Plaintiff responded well to instructions, had good confidence in his own abilities, his thoughts were "logical, organized and goal directed," and that Plaintiff did not "engage in any exaggeration or minimization of his symptomology."  (Tr. 311.)  Mr.

Jeter's summary was that Plaintiff "presents as [a]nxious with vocal modulation and hand shaking and wringing problems. His [d]epression is reported as 'mild with meds.' He presents as far more [a]nxious than [d]epressed." (Tr. 312.) Mr. Jeter diagnosed Plaintiff with "Generalized Anxiety Disorder (moderate)," a history of major depression with single episode, and assigned Plaintiff a GAF score of 68. (*Id.*)

That same month, Dr. Syd Joseph reviewed Plaintiff's medical records for the state DDS and completed Psychiatric Review Technique and Mental Residual Capacity Assessment forms. (Tr. 325-42.) He determined that Plaintiff had a history of major depressive disorder, and also had the medically determinable impairment of generalized anxiety disorder. (Tr. 328, 330.) Regarding the B criteria, he found that Plaintiff had a mild limitation in activities of daily living, a moderate limitation in social functioning, a moderate limitation in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 335.) Dr. Joseph stated that Plaintiff could perform simple, repetitive tasks on a regular and continuing basis. (Tr. 324.)

From at least February 2003 through at least August 2009, Dr. Mika was Plaintiff's general treating physician. In the spring of 2007, around the time Plaintiff discontinued treatment at ABM, Dr. Mika began prescribing Plaintiff Klonopin and Wellbutrin. (Tr. 344.) In December 2008, Dr. Mika diagnosed Plaintiff with anxiety, and, in August 2009, Dr. Mika diagnosed Plaintiff with depression and anxiety. (Tr. 411, 419.) Dr. Mika's medical records do not contain any substantive discussion of Plaintiff's anxiety or depression, the severity of those diagnoses, or any resulting

12

functional limitations from those conditions.  (Tr. 343-95, 397-410, 411-42.)[4,5]

*(b) Plaintiff's Physical Conditions*

Dr. Mika  treated Plaintiff's hypertension continuously from early 2003 through 2009.  (*See*

Tr. 343-95, 397-410, 411-42.)  In February 2003, Dr. Mika diagnosed Plaintiff with hypertensive

vascular disease ("HTVD").  (Tr. 395.)  This diagnosis  is occasionally accompanied by a notation

of "stress" in the treatment records.  (*E.g.*, Tr. 380, 382, 383).  Dr. Mika consistently prescribed

_____

[4]Dr. Mika's notes are quite cryptic and often illegible.

[5]Plaintiff urges this Court to consider an opinion by Mr. Bon completed in November 2009—after the ALJ's decision.  Mr. Bon's opinion provides that "[a]t the time I saw Mr. Hitdlebaugh, the anxiety he experienced secondary to his depression precluded sustained work." (Tr. 489.)  Mr. Bon also completed a form which provides that Plaintiff has "moderately severe" and "severe" limitations in various areas, including, the ability to carry out detailed instructions, the ability to complete a normal workweek without interruptions from psychologically based symptoms, and the ability to respond appropriately to changes in the work setting.  (Tr. 488-89.)

This Court declines Plaintiff's invitation to consider Mr. Bon's opinion.  (Tr. 1.)  Where, as here, the Appeals Council denies a claimant's request for a review based on new material, this Court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).   The additional evidence may only be considered for purposes of determining whether remand is appropriate under sentence six of 42 U.S.C. § 405(g).  But a sentence six remand requires "a showing . . . that there is good cause for the failure to incorporate [the new] evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).  "Good cause is demonstrated by a showing that something extrinsic to the claimant's prosecution of his claim and beyond his control prevented timely production of evidence." *Haney v. Astrue*, No. 5:07CV188-J, 2009 WL 700057, at *6 (W.D. Ky. Mar. 13, 2009).

Even if this Court is permitted to *sua sponte* treat Plaintiff's reliance on Mr. Bon's opinion as a request for a sentence six remand, *see Street v. Comm'r of Soc. Sec.*, 390 F. Supp. 2d 630, 640 (E.D. Mich. 2005), nothing suggests that Plaintiff has good cause for failing to submit an opinion from Mr. Bon to the ALJ.  In the spring of 2007, Plaintiff's insurance ran out and he stopped seeing Mr. Bon regularly.  Further, Mr. Bon's opinion provides that he last saw Plaintiff in March 2008.  (Tr. 2008).  Both of these dates are well before the September 2009 hearing before the ALJ–at which Plaintiff was represented by counsel.  *See Steel v. Comm'r of Soc. Sec.*, No. 09-11658, 2010 WL 3026380, at *9 (E.D. Mich. Apr. 1, 2010) ("'[G]ood cause contemplates more than strategic delay, or sandbagging[] of evidence[,] and more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability.'" (quoting *Haney*, 2009 WL 700057, at *6)).

13

medications for Plaintiff's blood pressure.  (Tr. 151, *e.g.*, Tr. 353, 378-79.)

The Transcript indicates that Plaintiff first started having symptoms related to his diverticulitis in July 2006.  (*See* Tr. 357.)  Dr. Mika's office notes from this period evidence that Plaintiff was scheduled for a colonoscopy in August 2006.  (*Id.*)  The physician reviewing the colonoscopy results noted "hiatal hernia with gastroesophageal reflux," "prominent gastric mucosal folds," and diverticulosis.  (Tr. 356.)

In November 2006, Plaintiff complained of right shoulder pain.  (Tr. 352, 354.)  A right shoulder x-ray revealed minimal arthritis.  (Tr. 354.)  In December 2006 and January 2007, Dr. Mika's diagnoses included a "frozen" right shoulder and it appears he treated Plaintiff with joint injections.  (Tr. 349, 352.)

In August 2007, Plaintiff sought treatment from Dr. Mika for heel pain.  (Tr. 430-32.)  An x-ray revealed a "small calcaneal spur" in Plaintiff's right foot.  (Tr. 442.)  Dr. Mika diagnosed Plaintiff with a right heel spur and plantar fasciitis.  (Tr. 431-32.)  He treated Plaintiff with three heel injections and a surgery was scheduled for November 2007.  (Tr. 430-32.)  As noted, Plaintiff testified that he has not had surgery on his foot, however.  (Tr. 49.)

*(c) Dr. Mika's June 2008 Opinion*

On June 4, 2008, Dr. Mika completed a disability form which is the focus of this case. (Tr. 343.)  Regarding Plaintiff's mental conditions, Dr. Mika diagnosed Plaintiff with depression, panic attacks, and high anxiety, and noted that Plaintiff was on anxiety medication that made him tired.  (*Id.*)

As to Plaintiff's physical limitations, Dr. Mika diagnosed Plaintiff with severe HTVD, plantar fasciitis, and degenerative joint disease of the shoulder.  (Tr. 343.)  The form further provides

14

that Plaintiff could stand for 30 minutes at one time but no more than two hours in an eight-hour day, that he could sit for two hours at a time but no more than four hours in an eight-hour day, and that he could only lift 20 pounds occasionally, and 10 pounds frequently.  (*Id.*)  Dr. Mika also concluded that Plaintiff was limited to occasionally bending, stooping, and balancing, and that Plaintiff had limitations in raising his *left* arm about shoulder level and manipulating his *left* hand. (*Id.*)

In response to the question, "Do you think the patient has the capability of performing a sedentary low stress job on a 40-hour work week on a regular and sustained basis," Dr. Mika answered, "No."  (*Id.*)  He reasoned, "[Plaintiff] suffers from extreme anxiety and panic attacks.  He has difficulty even shopping at the store for basic needs.  Totally disabled from any work."  (*Id.*)

### 3. Vocational Expert's Testimony

Vocational Expert ("VE") Dr. James Engelkes testified at the hearing.  The ALJ asked the VE to assume the following hypothetical individual:

> [one who] can meet the demands of light work, should never use ladders, scaffolds, or ropes, should only occasionally use ramps, stairs, stoop, kneel, crouch, and crawl, should avoid exposure to hazards [and can] only work at one- or two- or three-step instructions, only simple, unskilled work, no jobs involving concentration and detailed or precision tasks or multi-tasking, no jobs that would require the individual to compute, calculate problems however reason[ed], work that does not require teamwork or work in close proximity to co-workers, routine work without changes or adaptions in work settings or duties more than once a month, and work that would not require the individual to take initiative or to make independent job decisions.

(Tr. 66.)  The VE testified that such a person could not perform Plaintiff's past relevant work at the landfill.  (*Id.*)  Accordingly, the ALJ asked the VE to consider a person with the above limitations that also had Plaintiff's "vocational profile relative to age, education, and work history."  (Tr. 66.)

15

The VE testified that such a person could work as a janitor, housekeeper, or sorter/folder, and that there would be 12,000, 14,000, and 3,000 such jobs in the lower-peninsula of Michigan, respectively.  (Tr. 67.)  The VE further stated that even if the hypothetical individual would need a "sit/stand option" the sorter/folder position would still be available to him, and a "general office clerk" position would also be available.  (Tr. 67.)

On cross, the VE testified that if all Plaintiff's testimony was credited, he would not be able to work.  (Tr. 68.)  While the VE's explanation is unclear, it appears that he reasoned that if in fact Plaintiff's pain limited standing to only two hours in an eight-hour day and Plaintiff had four bad days a week, Plaintiff would be precluded from work.  (*See* Tr. 68.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits

16

are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since November 21, 2003—Plaintiff's alleged onset date.  (Tr. 18.)  At step two, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, high blood pressure, diverticulitis, and plantar fasciitis.  (Tr. 19.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 19-20.) In examining the B criteria associated with mental impairments, *see* 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.04, the ALJ found that Plaintiff had mild restrictions in daily living, moderate difficulties in social function and concentration, persistence, and pace, and no episodes of decompensation of extended duration. (*Id.*)  Between steps three and four, the ALJ determined that

17

Plaintiff had the residual functional capacity to perform light work as qualified by a significant number of additional limitations.  (Tr. 20.)  At step four, the ALJ found that Plaintiff could not perform his past relevant work as a heavy equipment operator.  (Tr. 22.)  At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform.  (Tr. 23.)  These jobs include janitor, housekeeper, and sorter/folder, for which there were 12,000, 14,000, and 3,000 positions, respectively, in Michigan's lower peninsula.  (Tr. 23.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);  *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is

limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

**F. Analysis**

Plaintiff argues that the ALJ failed to give Dr. Mika's June 2008 opinion proper deference, and failed to follow the procedural requirements for rejecting a treating source opinion. (Pl.'s Mot. at 6-13.) The Commissioner responds that "while the ALJ did not discuss his reasons for rejecting Dr. Mika's opinion with the particularity Plaintiff prefers . . . the ALJ provided good reasons for finding that Dr. Mika's opinion was not entitled to the special weight afforded to treating medical sources." (Def.'s Mot. at 14.).

As will be discussed in detail below, regarding Plaintiff's mental impairments—although the

line is not bright—the Court finds that while the ALJ has fallen short of explicitly providing good reasons for rejecting the Dr. Mika's opinion, he indirectly attacked that opinion and implicitly satisfied the reasons-giving requirement of the treating physician rule.  Regarding Dr. Mika's opinion on Plaintiff's physical impairments, the Court finds that the ALJ satisfied the treating physician rule by incorporating all credible-aspects of Dr. Mika's opinion into his RFC, and, if any procedural deficiency exists, it does not warrant remand.

### 1. The Procedural Requirements of the Treating Physician Rule

In assessing the medical evidence supporting a claim for disability benefits, an ALJ must apply the "treating physician rule": an ALJ must generally give greater deference to the opinions of treating physicians than to those of non-treating physicians.  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; SSR 96-2p.  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)).  And even where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source."  *Id.*; 20 C.F.R. § 404.1527.

This Regulation, 20 C.F.R. § 404.1527(d)(2), "contains a clear procedural requirement."

*Wilson*, 378 F.3d at 544.  In particular, "the [ALJ's] decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188 at *5; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  Moreover, "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The Sixth Circuit has suggested, however, that a violation of the procedural requirement might be "harmless error" in the following circumstances:  (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation."  *Wilson*, 378 F.3d at 547.  "In the last of these circumstances, the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments."  *Friend*, 375 F. App'x at 551 (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006)).

> ### 2. Although the ALJ Did Not Explicitly Satisfy the Explanatory Requirement of the Treating Physician Rule in Rejecting Dr. Mika's Opinion as to Plaintiff's Mental Conditions, the Court Excuses the Error as Harmless

>> #### (a) The ALJ Did Not Explicitly Satisfy the Explanatory Requirements in Rejecting Dr. Mika's Opinion as to Plaintiff's Mental Conditions

Regarding Plaintiff's mental conditions, in his June 2008 opinion, Dr. Mika diagnosed Plaintiff with depression, panic attacks, and high anxiety. (Tr. 343.) The opinion also provides that Plaintiff "suffers from extreme anxiety and panic attacks. He has difficulty even shopping at the store for basic needs. Totally disabled from any work." (Tr. 343.)

The parties do not dispute that Dr. Mika was Plaintiff's treating physician. At issue then, is whether the following passage from the ALJ's narrative provides "good reasons" for rejecting Dr. Mika's opinion:

> As for the opinion evidence, in June 2008 Dr. Mika opined the claimant was totally disabled from any work. This opinion is not supported by Dr. Mika's reports or consistent with the record as a whole. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely [to exist] in situations where the opinion in question departs substantially from the rest of the record, as in the current case. Therefore the undersigned rejects this opinion.

(Tr. 22.)

This explanation does not provide the requisite "good reasons" demanded by 20 C.F.R. § 404.1527(d)(2), SSR 96-2p, and the accompanying case law. The Sixth Circuit's decision in *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543 (6th Cir. 2010) is particularly instructive. In

22

*Friend*, the claimant's treating physician, Dr. Angerman, a general practitioner, referred the claimant to a specialist for an investigation into the claimant's heart problem. *Id.* at 545. Over a four-year period, the claimant underwent several tests with physicians other than Dr. Angerman. *Id.* at 545-47. Upon the plaintiff's return to Dr. Angerman, the doctor completed a Physical Functional Capacity Assessment form indicating that the claimant could only "stand or walk one hour per eight-hour day." *Id.* The ALJ rejected this opinion in favor of the opinion of a reviewing physician that testified at the hearing. *Id.* The ALJ reasoned that "'the testimony of [the testifying physician] which would allow the claimant to stand/walk for one hour [at a] time to a total of six hours in an eight hour workday, is more consistent with the objective clinical findings,' and 'there is no basis for Dr. Angerman's conclusion that the claimant can stand/walk for only one hour in a day.'" *Id.* at 548.

The Sixth Circuit held that the ALJ's explanation was insufficient to satisfy the reasons-giving requirement. In particular, the Court reasoned that the ALJ failed to identify, let alone discuss, the particular "objective clinical findings" he found inconsistent with the treating-source opinion. The Court further explained that,

> even when an ALJ correctly reaches a determination that a treating source's medical opinion is inconsistent with the other substantial evidence in the record, such a determination means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.

*Friend*, 375 F. App'x at 551 (internal citations omitted).

Here, the ALJ rejected Dr. Mika's opinion because it was not supported by his own medical records regarding Plaintiff and was not "consistent with the record as a whole." (Tr. 22.) While the

23

ALJ provided some additional, more specific reasons discussed below, as in *Friend*, he did not explicitly compare the medical evidence or opinions that are inconsistent with the treating-source opinion and did not explicitly discuss the weighting factors outlined in the regulation.  20 C.F.R. § 404.1527.

In short, to comply with the reasons-giving requirement of the treating physician rule,  "it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."  *Friend*, 375 F. App'x at 551. Given this stringent requirement, the Court finds that—while a close-call—the ALJ did not explicitly satisfy the reasons-giving procedural rule.

> *(b) The ALJ Implicitly Satisfied the Explanatory Requirements of the Treating Physician Rule in Rejecting Dr. Mika's Opinion as to Plaintiff's Mental Conditions*

As an initial matter, the ALJ was not required to give any weight to  Dr. Mika's ultimate conclusion as to disability.  This determination is within the sole province of the ALJ.  *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (holding that ALJ correctly disregarded treating physician's statement that claimant was "100% disabled" because the regulations reserve this determination for the Commissioner, and noting that the regulations further state "that no 'special significance' will be given to opinions of disability, even those made by the treating physician (citing 20 C.F.R. § 404.1527(e)(1), (e)(3))).

Second, as the ALJ explicitly mentioned in his narrative, nothing in Dr. Mika's medical records suggests the kind of work-preclusive "extreme anxiety" that appears in Dr. Mika's June 2008 opinion.  Dr. Mika noted on a number of occasions that Plaintiff suffered from anxiety and

stress, and he prescribed Plaintiff medication for anxiety and depression. But Dr. Mika's medical records do not contain a substantive discussion of Plaintiff's anxiety or its severity, an explanation as to any functional limitations as a result of that anxiety, or objective or diagnostic testing done to determine the severity of Plaintiff's symptoms and any accompanying functional limitations. In short, Dr. Mika's opinion is conclusory and he makes no effort to tie his opinion to his or other medical records supporting the type of extreme anxiety he opined in June 2008.

In determining whether the ALJ implicitly satisfied the procedural protections of 20 C.F.R. § 404.1527 by indirectly attacking these portions of Dr. Mika's opinion, the Court must also consider the Sixth Circuit's opinion in *Nelson*, 195 F. App'x at 470-71. Similar to Mr. Hitdlebaugh, the claimant in *Nelson* filed for disability based on "anxiety, lack of concentration, panic attacks, feelings of hopelessness, and nervousness around others." *Id.* at 463. Two psychiatrists treated the claimant for separate ten month periods. *Id.* at 463-64, 466. The first opined that the claimant had "poor or no ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, or deal with work stresses." *Id.* at 464. The second remarked that the claimant was "was markedly impaired in carrying out short, simple instructions and responding to changes in a routine work setting; and that he was extremely impaired in understanding, remembering, and carrying out detailed instructions, in interacting appropriately with the public and with supervisors, and in responding to pressures in a usual work setting." *Id.* at 466. The VE testified that if the claimant was limited in the manner these two physicians opined, the claimant would be precluded from work. *Id.* at 471. The ALJ, however, failed to discuss "specifically what weight" he gave to the two opinions, and concluded that the claimant could return to his past relevant work. *Id.* at 467.

25

The Court of Appeals found that while the ALJ's narrative did not satisfy the reasons-giving requirement of the treating physician rule, including the failure to discuss the treating-source opinion weighting factors, the non-conformity was harmless because the ALJ discussed other medical evidence that undermined the supportability of the two undiscussed opinions. *Id.* at 471. In particular, the Court noted that the two opinions were in "obvious conflict" with the medical opinions of five other physicians who found that the claimant had only moderate limitations, with intact memory, concentration, and attention, and could work "alone or in a very reinforcing setting." *Id.* Because the ALJ specifically discussed four of these contrary opinions in the narrative, the Court concluded that the ALJ implicitly satisfied the reasons-giving requirement: "[w]e think it clear that the ALJ's discussion of the record evidence shows that the ALJ found the [two treating-source] opinions . . . to be inconsistent with the other record evidence." *Id.* at 471. The Court cautioned, however, that the case before it was "a rare case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter." *Id.* at 472.

The Court believes that this too is a "rare case" where the ALJ implicitly satisfied the requirement to give good reasons for rejecting the treating physician's opinion regarding the severity of Plaintiff's mental impairments. First, even more explicit than in *Nelson*, the ALJ here outright stated that Dr. Mika's opinion was inconsistent with the record as a whole and that Dr. Mika's *own* medical records did not support his opinion. (Tr. 21-22.) Second, like the ALJ in *Nelson*, the ALJ here cited other medical sources who evaluated Plaintiff and provided an opinion inconsistent with Dr. Mika's.

Although Plaintiff argues otherwise, the ALJ considered Plaintiff's counseling records from

ABM.[6]  The ALJ noted that Dr. Rockwell assigned Plaintiff a "moderate" GAF score of 60.  (Tr. 18, 22, 300.)  Mr. Bon contemporaneously assigned Plaintiff the same GAF score.  (Tr. 296.)  It is significant that these scores were given at the outset of Plaintiff's treatment at ABM because the ABM records—recounted at length above—indicate that Plaintiff's mental health improved from the outset of treatment.  Specifically, Plaintiff's diagnosis of depression evolved from "severe" to "in partial remission." The  latter diagnosis was never changed back, and on several occasions Mr. Bon, Dr. Rockwell, and Dr. Hires suggested that Plaintiff's mental condition had improved as compared to his mental state at the outset of treatment. (*E.g.*, Tr. 184, 185, 200, 206-07, 229, 236, 245, 256, 260-61, 264.)

        The ALJ also discussed the results of Mr. Jeter's consultative exam.  (Tr. 19.)  He noted that while Mr. Jeter found that Plaintiff was anxious, and found that Plaintiff had "generalized anxiety disorder," he nonetheless assigned Plaintiff a GAF score of 68.  (Tr. 19.)  The ALJ emphasized that this indicates "mild" mental limitations.  (Tr. 19.)  He also noted that Mr. Jeter found that Plaintiff "was cooperative, motivated, verbally responsive, attempted all tasks and worked diligently during the evaluation."  (Tr. 20.)  And, although not explicitly mentioned by the ALJ, it is significant that Mr. Jeter concluded that Plaintiff's generalized anxiety disorder was "moderate."  (Tr. 312.)  The ALJ's discussion of Mr. Jeter's opinion and, more specifically, his anxiety diagnosis, strongly suggests that the ALJ was cognizant of this severity indicator and considered it when rejecting Dr. Mika's opinion.

---

[6]Plaintiff asserts that the ALJ ignored one of two "1F" exhibits—the one containing Mr. Bon's counseling notes.  (Pl.'s Mot. at 7.)  However, the ALJ acknowledged those counseling records in his narrative, (Tr. 18), and cited a particular counseling note, nestled among many, when referring to Plaintiff's body-shop work, (Tr. 22).

Summarizing the evaluations of the specialists at ABM and Mr. Jeter, the ALJ concluded:

> The claimant was assessed GAF scores of 60 and 68, which are indicative of only mild psychological symptoms and are not work preclusive. He does not have any psychotic symptoms and does not need a structured living arrangement. The claimant lives alone and provides a wide range of daily living.

(Tr. 22.)

The ALJ also implicitly attacked Dr. Mika's conclusion that Plaintiff could not shop for basic needs. Specifically, the ALJ noted that Plaintiff lives alone, "cooks, does laundry, goes grocery shopping, mows the lawn with a tractor and is helping restore a car. He stated he visits with his sister. . . . The claimant testified that he occasionally volunteers at the VFW hall washing dishes." (Tr. 21.) The ALJ also noted, citing Mr. Bon's counseling records, that "in November 2006 the claimant stated he was working 8 to 12 hours per week for his friend." (Tr. 22.)

Given the forgoing, the Court concludes that while the ALJ may not have completely complied with the letter of the reasons-giving requirement, he complied with its aim. As SSR 96-2p requires, the ALJ's opinion was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." 1996 WL 374188 at *5. Specifically, taking the ALJ's explicit statement that Dr. Mika's opinion was inconsistent with the record as a whole and not supported by Dr. Mika's records, coupled with what is implicit in his narrative—that the evaluations of Mr. Jeter, Mr. Bon, and Dr. Rockwell were inconsistent with that of Dr. Mika, and that he was crediting Plaintiff's own testimony about daily living over Dr. Mika's conclusory statement about Plaintiff's inability to shop for basic needs—this Court does not see the need to remand for the ALJ to make explicit what is already implicit in his ruling. *See Friend*, 375 F. App'x at 551 ("[T]he procedural rule is not a procrustean bed, requiring

28

an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").  The Court is able to discern the ALJ's reasoning from the totality of his opinion.  Accordingly, any procedural flaw in the rejection of Dr. Mika's opinion on the severity of Plaintiff's depression and anxiety was harmless.

Largely for the reasons just provided, the Court further finds that there is substantial evidence to uphold the ALJ's decision to reject Dr. Mika's opinion that Plaintiff suffers from "extreme anxiety and panic attacks" that render Plaintiff "totally disabled from any work"; or, tempering the opinion in a manner favorable to Plaintiff, Plaintiff's anxiety is extreme enough to make it difficult to "shop for basic needs."  (*See* Tr. 343.)

A review of Mr. Bon's notes from ABM reveals that Plaintiff's anxiety increased when he faced various stressors in his life: the pending retirement benefits decision, a new house-mate, customer demands when volunteering at the VFW, and questions from Dr. Mika about the possibility of returning to work.  (Tr. 120, 213, 234, 286.)  However, accompanying these periods of increased anxiety are other notes suggesting that Plaintiff's anxiety was not as extreme as Dr. Mika opined.  For example, although the stress from the bingo-night customers at the VFW reminded Plaintiff of his old job at the landfill, Mr. Bon remarked that Plaintiff "was able to draw distinctions that made his VFW hall work different," and that he was "coping with new social anxiety." (Tr. 234.)  Mr. Bon also noted that Plaintiff "has been able to keep [the stresses of the house-mate and the VFW] in perspective" and "been able to stay optimistic."  (Tr. 229.)  In July 2005, Plaintiff received a letter asking for disability documentation which led to heightened anxiety because it reminded him of returning to his old job.  (Tr. 218.)  But two weeks later, Plaintiff told

Mr. Bon that while he experiences nervousness, he felt "he has enough support to carry out what he needs to do." (Tr. 216.)  A couple months later, Plaintiff reported to Dr. Hires that Klonopin, which was prescribed for Plaintiff's anxiety, was working well, and she noted, "[a]nxiety well controlled." (Tr. 209, 217.)  In August 2006, Mr. Bon noted that "Plaintiff gets anxious about being depressed, but was able to get a perspective on how he has gotten better over the last three year[s]." (Tr. 185.) In October 2006, Plaintiff was only "mildly anxious" about his work disability.  (Tr. 177.)  In short, Plaintiff is correct that the ABM records reflect that Plaintiff had bouts of increased anxiety from various stressors, primarily reminders of returning to his old job.  But, at the same time, a reasonable interpretation of the ABM records is that Plaintiff had improved since the outset of his treatment at ABM and developed skills to manage his anxiety—at least in significant part.  It was not unreasonable for the ALJ to interpret the ABM records as not supporting the type of "extreme anxiety and panic attacks" suggested by Dr. Mika's June 2008 opinion.

The question on substantial evidence review is not merely whether evidence exists in the record that supports Dr. Mika's opinion of extreme anxiety.  Rather, the proper inquiry is whether, considering the record as a whole, substantial evidence exists to uphold the ALJ's decision to reject Dr. Mika's opinion.  *See Rogers*, 486 F.3d at 241 ("In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Thomas v. Astrue*, No. 3:10cv00099, 2011 WL 839276, at *6 (S.D. Ohio Jan. 28, 2011) ("Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings." (citing *Rogers*, 486 F.3d at 241)).

In sum, the Court finds that while the ALJ may not have explicitly complied with the reasons-giving requirement of the treating physician rule in rejecting Dr. Mika's opinion as to the severity of Plaintiff's mental conditions, he implicitly satisfied those demands. In addition, substantial evidence supports the ALJ's explicit and implicit reasons.

### 3. The ALJ Provided an Adequate Explanation for Rejecting Dr. Mika's Opinion as to Plaintiff's Physical Limitations, and to the Extent that the Explanation Was Inadequate, the Procedural Error Is Harmless

Dr. Mika's June 2008 opinion diagnosed Plaintiff with severe HTVD, plantar fasciitis, and degenerative joint disease of the shoulder. (Tr. 343.) The ALJ adequately addressed these physical impairments by incorporating all of the opinion's physical limitations, save those which are not credible, into his hypothetical to the VE. In particular, Dr. Mika found that Plaintiff could only lift 20 pounds occasionally, and 10 pounds frequently. (Tr. 343.) The ALJ's RFC, which is consistent with his question to the VE, limited Plaintiff to light work, *see* 20 C.F.R. § 404.1567—carrying a maximum of 20 pounds occasionally and 10 pounds frequently. (Tr. 20, 66.) Dr. Mika also concluded that Plaintiff was limited to occasionally bending, stooping, and balancing. (*Id.*) The ALJ's RFC is consistent: it provides that Plaintiff "should only occasionally . . . stoop, crouch, kneel or crawl." (Tr. 20.) Dr. Mika found that Plaintiff could stand for 30 minutes at one time but no more than two hours in an eight-hour day. The ALJ's RFC, which provides that Plaintiff could stand or walk for six hours, is more restrictive. However, he narrowed his hypothetical to the VE by asking if there would be significant jobs if the hypothetical individual required a "sit/stand option." (Tr. 67.) The VE answered affirmatively. (*Id.*)

The ALJ found the remainder of Dr. Mika's physical limitations to be deficient. Dr. Mika opined that Plaintiff could sit for at most two hours at a time and only for four hours over an eight-

hour day. (Tr. 343). This is not supported by substantial evidence in the record. The physical

diagnoses from Dr. Mika relate to Plaintiff's shoulder, his plantar fasciitis, and hypertension. (*Id.*)

None of these suggests any difficulty sitting. Nor is there anything in Dr. Mika's records that

suggests Plaintiff had any difficulty sitting. In fact, when the ALJ inquired as to a sitting limitation

at the hearing, Plaintiff equivocally responded "I don't know," and then said he could sit through

a movie. (Tr. 58-59.) Dr. Mika's June 2008 opinion also provides that Plaintiff had some limitation

with *left*-hand gross manipulation and with raising his *left* arm above his shoulder. (Tr. 343).

However, Dr. Mika's medical records only indicate *right* shoulder issues. (*See* Tr. 349, 351, 352,

354.) In testifying to left shoulder arthritis at the hearing Plaintiff referred to an x-ray from Dr.

Mika. (Tr. 50.) But the only shoulder x-ray in the record is of Plaintiff's *right* shoulder. (Tr. 354.)

While the state consultative examiner found bilateral shoulder arthritis, she found that this only

limited Plaintiff's external rotation and not his shoulder elevation, abduction, and adduction. (Tr.

307.) The examiner found no hand or finger limitations. (Tr. 308.) Finally, Dr. Mika opined that

Plaintiff's medications made him unsteady and tired. (Tr. 343.) Again, this is not reflected in any

of Dr. Mika's treatment records. In August 2007 Plaintiff told Mr. Jeter that he experienced no side

effects from his medication. (Tr. 310.) Moreover, Plaintiff testified at the hearing that although his

medications took some time to take effect, he experienced no side effects. (Tr. 51-52.)

Accordingly, the Court finds that the ALJ satisfied the reasons-giving requirement in

rejecting Dr. Mika's opinion as to Plaintiff's physical limitations. To the extent that there was any

non-compliance, the ALJ's error is harmless under the exceptions outlined in *Wilson*. *See* 378 F.3d

at 547 (noting that a violation of the reasons-giving requirement might be "harmless error" in the

following circumstances: (1) "a treating source's opinion is so patently deficient that the

32

Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion").

### G.  Conclusion

For the foregoing reasons, this Court finds that while the ALJ failed to comply with the reasons-giving requirement of the treating physician rule, this error is harmless when reading the ALJ's narrative as a whole.  The Court further finds that substantial evidence supports the ALJ's decision to reject the treating-source opinion at issue in this case.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  A copy of any objections is to be served upon this magistrate judge.  E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due

33

within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service

of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  April 29, 2011


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on April 29, 2011.


s/Jane Johnson
Deputy Clerk